# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

Division



FILED
IN THIS OFFICE

APR 3 0 2025

Clerk U.S. District Court
Greensboro NC
BY _____

Case No. **25cv332**

*(to be filled in by the Clerk's Office)*

George Platt
_____
Plaintiff(s)
*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

-v-

LeafFilter North LLC.
_____
Defendant(s)
*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Jury Trial: *(check one)* ☐ Yes ☒ No

## COMPLAINT FOR A CIVIL CASE

### I. The Parties to This Complaint

#### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | George Platt |
| Street Address | 6400 Old Oak Ridge Road Apt. E-16 |
| City and County | Greensboro, (Guilford County) |
| State and Zip Code | North Carolina 27410 |
| Telephone Number | 571-379-3111 |
| E-mail Address | George.platt62@gmail.com |

**B.** **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | LeafFilter North LLC |
| Job or Title *(if known)* | |
| Street Address | 1595 Georgetown Road |
| City and County | Hudson, (Summit County) |
| State and Zip Code | Ohio 44236 |
| Telephone Number | 800-749-4566 |
| E-mail Address *(if known)* | support@leafFilter.com |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

E-mail Address *(if known)* _____

## II. Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒ Federal question ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A. If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

31 U.S.C. §3730(h) (FCA retaliation); 29 U.S.C. §§201 et seq., §215(a)(3) (FLSA misclassification and retaliation); 42 U.S.C. §2000e et seq. (Title VII); 28 U.S.C. §2201 (Declaratory Judgment Act); U.S. Const. amend. XIV (Equal Protection); related claims under N.C. Gen. Stat. §§75-1.1, 95-240, 143-422.1.

### B. If the Basis for Jurisdiction Is Diversity of Citizenship

1. The Plaintiff(s)

   a. If the plaintiff is an individual

   The plaintiff, *(name)* _____, is a citizen of the

   State of *(name)* _____.

   b. If the plaintiff is a corporation

   The plaintiff, *(name)* _____, is incorporated

   under the laws of the State of *(name)* _____,

   and has its principal place of business in the State of *(name)*

   _____.

   *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2. The Defendant(s)

   a. If the defendant is an individual

The defendant, *(name)* _____, is a citizen of
the State of *(name)* _____. Or is a citizen of
*(foreign nation)* _____.

b. If the defendant is a corporation

The defendant, *(name)* _____, is incorporated under
the laws of the State of *(name)* _____, and has its
principal place of business in the State of *(name)* _____.
Or is incorporated under the laws of *(foreign nation)* _____,
and has its principal place of business in *(name)* _____.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3. The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

Plaintiff signed a Direct Seller Agreement on 10/3/2023 containing false representations of federal law. After raising the issue internally on 4/15/2024, Plaintiff was terminated within 24 hours. On 3/19/2025, defense counsel conditioned private resolution on disclosure of protected agency filings, declared an impasse, and invited this suit, as preserved by prior court order. Plaintiff suffered financial and ongoing harm. See attached Complaint.

## IV. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Plaintiff seeks declaratory, injunctive, and monetary relief as outlined in the attached continuation.

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:        04/30/2025

Signature of Plaintiff

Printed Name of Plaintiff        George Platt

### B. For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

# COMPLAINT

## I. INTRODUCTION

1.  Plaintiff George Platt, proceeding pro se, brings this action against Defendants LeafFilter North, LLC and its related entities ("Leaf" or "Defendants") for damages and equitable relief arising from Defendants' systemic scheme to misclassify workers, chill the exercise of legal rights, retaliate against protected conduct, engage in discriminatory practices, and mishandle sensitive consumer data. Central to this scheme is Defendants' deliberate misrepresentation of Internal Revenue Code ("IRC") §3508 within Clause 4.01 of their Direct Seller Agreement ("DSA"), imposing a coercive $50-per-day penalty to deter challenges to independent contractor status (Exhibit A).

2.  Defendants' own senior litigation employment counsel, Joseph Reiner Blalock of Benesch Friedlander Coplan & Aronoff LLP, admitted that the challenged liquidated damages clause has no basis in federal law, stating: "George, on this front, if Leaf stopped including the liquidated damages and attorneys' fees provision in its outside seller agreements, would that satisfy you?" (Exhibit B, made outside the context of any settlement offer). This admission, made by senior counsel at the partner level acting within the scope of his representation constitutes a binding party admission under Fed. R. Evid. 801(d)(2) and directly supports Plaintiff's claim that Defendants knowingly relied on a legally unsupportable provision to deter statutory challenges, contributing to Plaintiff's $7,667.68 IRS tax penalty and chilling the exercise of his protected rights.

1

3.   This alleged unlawful penalty clause (DSA §4.01) was designed to, and did, restrict workers' fundamental rights to contest misclassification and report statutory violations under federal and state law. Plaintiff alleges this conduct violates the Fair Labor Standards Act (29 U.S.C. §§201 et seq.), the False Claims Act (31 U.S.C. §§3729, 3730(h)), Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e et seq.), North Carolina's Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. §75-1.1), and North Carolina common law regarding wrongful discharge and breach of contract.

4.   Plaintiff diligently pursued administrative remedies with the Internal Revenue Service (IRS), Federal Trade Commission (FTC), Department of Labor (DOL), and Equal Employment Opportunity Commission (EEOC) and other regulatory agencies between September 2024 and March 2025. Plaintiff's subsequent proactive January 9, 2025, submission to the IRS detailing the misclassification was confirmed scanned into the IRS compliance system on March 10, 2025 (Exhibit C), demonstrating agency engagement prior to defense counsel declaring an impasse to negotiations and clearly stated preference for this litigation in place of negotiation on March 19, 2025 (Exhibit E), warranting equitable tolling of any applicable statutes of limitations. See *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990).

## II. NATURE OF THE ACTION

5.   This is a civil action seeking compensatory, punitive, liquidated, and treble damages, as well as declaratory and injunctive relief, arising from Defendants' breach of contract, retaliation in violation of the FCA and FLSA, unlawful worker misclassification, discriminatory practices, wrongful discharge in violation of North Carolina public policy, and unfair and deceptive trade practices.

6.   This action does not reassert claims resolved in the prior settlement but addresses remaining statutory and common law violations preserved by the Court's prior Order. To avoid burdening the Court with redundant filings, Plaintiff incorporates by reference all relevant pleadings from Case No. 1:24-CV-824-CCE-JEP (M.D.N.C.), particularly those documents establishing the factual background of Plaintiff's engagement with Defendants and the procedural history leading to this action.

7.   The claims arise from Defendants' specific retaliatory actions against Plaintiff and from broader systemic policies affecting a nationwide group of similarly situated individuals. In 2023–2024, LeafFilter employed at least 2,000 "3508 Direct Sellers" across its divisions, misclassifying them under a fabricated labor category: the "3508 Direct Sales Representative." Nationwide job postings confirm this designation was paired with obligations consistent with employee status under federal law (Exhibit D). Plaintiff reserves the right to pursue class and collective action certification following discovery.

## III. JURISDICTION, VENUE, AND ARTICLE III STANDING

8.   Federal Question: This action arises under the Fair Labor Standards Act (29 U.S.C. §§201 et seq.), the False Claims Act (31 U.S.C. §§3729, 3730(h)), and Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e et seq.). This Court has subject matter jurisdiction under 28 U.S.C. §1331.

9.   Supplemental Jurisdiction: This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. §1367, as they arise from the same common nucleus of operative facts.

10.    FCA-Specific Jurisdiction: Jurisdiction over Plaintiff's FCA retaliation claim is supported by 31 U.S.C. §3732(a).

11.    Venue: Venue is proper in the Middle District of North Carolina under 28 U.S.C. §1391(b) because Defendants conduct substantial business in this District, and a substantial part of the events giving rise to the claims occurred here, including Plaintiff's work and termination. No other court has equal or greater jurisdiction.

12.    Article III Standing: The Plaintiff has experienced specific, measurable injuries—including lost wages, commissions, tax liabilities amounting to $7,667.68, emotional distress, and reputational harm—which directly attribute to the Defendants' actions and seek remedy through a favorable court decision.

13.    Arbitration Preemption: Any clause purporting to mandate arbitration under the Direct Seller Agreement (DSA) is unenforceable as a matter of law and equity due to: (a) the absence of mutual obligation and resulting illusory promise, rendering the clause void under *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 606–07 (4th Cir. 2013); (b) Defendants' materially unlawful conduct in connection with the formation and enforcement of the agreement, including misrepresentation of statutory authority and retaliation for protected activity; and (c) the December 2024 settlement agreement, which resolved the enforceability of DSA §4.01 and expressly disclaimed its applicability to Plaintiff's preserved statutory and common law claims.

14.    Statute of Limitations: Plaintiff pursued administrative remedies with the IRS and FTC on September 6, 2024, and the DOL, EEOC and other agencies on September 13, 2024. Plaintiffs

4

subsequent IRS Form SS-8 was filed January 9, 2025, and was confirmed scanned into their Compliance System on March 10, 2025, supporting equitable tolling (Exhibit C).

## IV. PARTIES

15. Plaintiff: George Platt resides at 6400 Old Oak Ridge Rd., Apt E-16, Greensboro, NC 27410. He performed sales services for Defendants from Fall 2018 until his termination on April 16, 2024, signing the latest DSA on October 3, 2023.

16. Defendant: LeafFilter North, LLC is an Ohio limited liability company with its principal place of business at 1595 Georgetown Rd., Hudson, OH 44236, operating nationwide and registered in North Carolina.

17. Defendant (Leaf Entities): "Leaf Entities" includes LeafFilter North, LLC, its parents, subsidiaries, affiliates, and related entities under the "Leaf" brand. Plaintiff reserves the right to amend named defendants if discovery reveals additional culpable entities.

18. Similarly Situated Individuals: Plaintiff seeks certification of state law claims and FLSA claims for collective action under 29 U.S.C. §216(b) on behalf of himself and a nationwide class of "3508 Direct Sellers" subjected to Leaf's DSA §3508 penalty, misclassification, and related practices, pending discovery. The proposed class includes all Direct Sellers subject to Leaf's DSA §3508 clauses from 2021–2025, sharing common issues of misclassification and the threat of retaliation.

# V. FACTUAL BACKGROUND

## A. Procedural History & Exhaustion Efforts

19. On October 2, 2024, Plaintiff filed Case No. 1:24-CV-824-CCE-JEP (M.D.N.C.), asserting claims of misclassification, retaliation, data security breaches, and discrimination. Pursuant to the Court's March 17, 2025, Order (Doc. 18), which denied enforcement of the limited settlement agreement but preserved Plaintiff's right to pursue unresolved claims through a new action, this Complaint references and incorporates by reference all filings, pleadings, and evidentiary materials from Case No. 1:24-CV-824-CCE-JEP without duplication, preserving the procedural history and record established therein.

20. In December 2024, a limited settlement resolved DSA §4.01's enforceability against Plaintiff, dismissing the case without prejudice and preserving all other claims.

21. Plaintiff pursued administrative remedies with the IRS and FTC on September 6, 2024, and with the DOL, EEOC, and additional agencies on September 13, 2024. His IRS Form SS-8, filed January 9, 2025, was confirmed scanned into the IRS Compliance System on March 10, 2025, reinforcing equitable tolling grounds (Exhibit C).

22. On March 17, 2025, the Court denied Plaintiff's motion to enforce the partial settlement agreement, holding that unresolved claims may proceed through a new action if Rule 11 compliant.

23. On March 19, 2025, Plaintiff proposed a settlement framework addressing unresolved issues; Defendants' counsel conditioned further discussion on Plaintiff disclosing confidential agency submissions (Exhibit E).

6

24. On March 20, 2025, Blalock rejected further negotiations, stating, "Looks like we are at impasse… Happy to sit back and wait for service of your complaint," confirming unwillingness to resolve outstanding claims voluntarily (Exhibit E).

25. On March 24, 2025, Plaintiff reported a live consumer data breach to Blalock involving Customer X's financial records; Blalock replied only, "let me get back to you on that," and offered no corrective action (Exhibit E).

26. Plaintiff exhausted all internal, administrative, and judicial remedies, satisfying statutory prerequisites.

**B. Key Events & Timeline Summary**

27. From 2018 to 2025, Plaintiff alleges that Defendants orchestrated a calculated strategy of statutory mimicry to misclassify approximately 2,000 Direct Sellers, exploit their labor, silence dissent, and mishandle consumer data—harming Plaintiff, similarly situated individuals nationwide, and the public (Exhibit D).

a. Fall 2018: Plaintiff begins work as a "3508 Direct Sales Representative," unaware of Defendants' fabricated labor category (Exhibits C, D).

b. October 3, 2023: Plaintiff signs the Leaf DSA, with the embedded §4.01's unlawful $50-per-day penalty for challenging contractor status (Exhibit A).

c. March 27, 2024: Plaintiff emails supervisors requesting his 1099, reporting observed racial discrimination, religious coercion, and unsafe data practices, and submitting a 30-day notice contingent on remediation.

7

d. April 14, 2024: Plaintiff emails Leaf Human Resources a screenshot comparing DSA §4.01 representation of IRC 3508 to the true IRC §3508, exposing its misrepresentation and warning of public policy violations (Exhibit E).

e. April 15, 2024: Plaintiff discusses these concerns by phone with Leaf Agent Brian Swan, who acknowledges issues and promises to consult Operations Manager Chris Oakley the next day (Exhibit E).

f. April 16, 2024: Swan terminates Plaintiff within 24 hours without cause, locking him out of systems and citing "failure to report to work" (a typical employee obligation) despite having spoken with him the day prior—demonstrating pretext and retaliation.

g. April 23, 2024: Swan recharacterizes the termination as a "resignation," invoking DSA confidentiality clauses and disregarding the 30-day notice requirement under §9.02 (Exhibit F).

h. September 6, 2024: Plaintiff files IRS and FTC complaints, alleging tax fraud and data security failures (Exhibit C).

i. September 13, 2024: Plaintiff files DOL and EEOC complaints, alleging misclassification, retaliation, and discrimination (Exhibit C).

j. October 2, 2024: Plaintiff files Case No. 1:24-CV-824, asserting FLSA, FCA, and other claims.

k. December 6, 2024: Settlement resolves §4.01's enforceability, preserving other claims.

l. January 9, 2025: Plaintiff files IRS Form SS-8, documenting a $7,667.68 tax penalty for 2021 due to misclassification (Exhibit C).

m. March 10, 2025: IRS logs SS-8, supporting tolling (Exhibit C).

n. March 17, 2025: Court authorizes this action (if the parties are unable to resolve the issues between them).

8

o. March 19, 2025: Plaintiff proposes settlement to defense counsel, addressing misclassification and data breaches (Exhibit E).

p. March 20, 2025: Blalock rejects settlement discussions (Exhibit E).

q. March 24, 2025: Plaintiff reports a live data breach involving Customer X's financial records; Defendants never responded beyond Blalock's vague reply, "Let me get back to you on that" (Exhibit E).

r. April 24, 2025: Plaintiff files this Complaint, having exhausted remedies.

## C. Defendants' Misrepresentation of IRC §3508 & Unlawful Penalty Clause

30. Defendants' DSA §4.01, titled "IRC §3508," states: "Pursuant to Internal Revenue Code §3508, Direct Seller will not be treated as an employee..." It imposes a penalty: "DIRECT SELLER AGREES THAT HE WILL NOT... CONTEST THIS SECTION... DIRECT SELLER FURTHER AGREES THAT IF HE VIOLATES THIS SECTION... DIRECT SELLER WILL BE IN BREACH... AND WILL PAY TO COMPANY LIQUIDATED DAMAGES OF $50 PER DAY... AS WELL AS COMPANY'S REASONABLE ATTORNEY'S FEES..." (Full text comparison see Exhibit A).

31. This clause unambiguously misrepresents IRC §3508, which governs only tax treatment of direct sellers and authorizes no private penalties or fee-shifting, exploiting workers' trust in federal law (Exhibit A).

32. Defendants' counsel, Joseph R. Blalock, admitted no legal basis exists: "...Leaf cannot produce documents supportive of the claim that IRC §3508 permits employers to take the kind of action or inaction described..... no such documents exist anywhere" (Exhibit B).

33. This penalty is a contractual deterrent, designed to intimidate workers, silence challenges to

misclassification, and shield Defendants' unlawful practices, rendering §4.01 void under federal preemption.

**D. Defendants' Systemic Control & Worker Misclassification**

34. From 2023 to 2024, Defendants misclassified ~2,000 Direct Sellers, including Plaintiff, as contractors under their fabricated "3508 Direct Seller" category, while imposing employee-like control (Exhibits C, D).

35. Defendants' job postings and policies mandate:

a. Weekly meetings and mandatory training.

b. Prescribed sales scripts and materials dictating methodology.

c. Pre-set leads and appointments.

d. Fixed schedules, and being on-call, requiring full-time availability.

e. Branded attire and "Commercial Accounts Manager" titled business cards and ID Badges.

f. Ongoing supervision, coaching, and discipline.

g. Non-compete restrictions limiting work elsewhere.

h. Unilateral termination rights at Defendants' discretion.

36. Operations Managers conducted "ride-alongs" to enforce performance and adherence to company process, treating sellers in fact as employees (Exhibit D).

37. Plaintiff's work was integral to Defendants' business, requiring minimal initiative (Exhibits C, D).

38. Plaintiff's IRS Form SS-8, filed January 9, 2025, analyzed these controls, confirming employee status and a $7,667.68 tax penalty for 2021 due to Defendants' fraudulent 1099s (Exhibit C).

39. Across approximately 150 LeafFilter offices and 50 Leaf Entity offices (e.g., Leaf Home

10

Water Solutions, etc.), Defendants employed at least 2,000 Direct Sellers nationwide in 2023–2024, all subjected to §4.01's penalties, supporting class and collective action (Exhibit D).

**E. Defendants' Retaliation Against Plaintiff's Protected Activities**

40. In March–April 2024, Plaintiff challenged Defendants' practices by reporting religious coercion, racial discrimination he personally witnessed, and ongoing data security lapses, engaging in protected activity under the FLSA, FCA, and Title VII (Exhibits C, E). On March 27, 2024, Plaintiff submitted a 30-day notice under DSA §9.02, contingent on Defendants addressing his concerns about discrimination and data security, demonstrating his intent to resolve issues internally before escalating. On April 14, 2024, he sent Human Resources a screenshot comparing DSA §4.01 to IRC §3508, exposing its misrepresentation and warning of public policy violations. On April 15, 2024, he discussed these concerns by phone with Leaf Agent Brian Swan, who promised to escalate the matter to management (Exhibit E).

41. On April 16, 2024, Swan terminated Plaintiff, locking him out and citing being "not reachable," a pretextual excuse contradicted by the prior day's contact (Exhibit E).

42. The one-day proximity establishes causation. (Exhibit E).

43. Defendants fired Plaintiff to silence his challenge to their unlawful scheme.

**F. Breach of Contract – Failure to Provide Notice**

44. DSA §9.02 requires 30 days' written notice for termination without cause (Exhibit A).

45. Defendants breached this by terminating Plaintiff on April 16, 2024, without notice (Exhibit E).

46. This caused ~$10,000 in lost wages and commissions.

## G. Defendants' Systemic Data Security Failures & UDTPA Violations

47. DSA §6.01 required Leaf to meet reasonable requests necessary to Plaintiff's duties. Plaintiff's request that Leaf comply with the FTC Safeguards Rule, 16 C.F.R. §314.4(c), was reasonable and reflected Leaf's non-delegable duty to protect customer information. Leaf's refusal breached both §6.01 and federal data security law.

48. Defendants required workers to use unsecured apps and devices without encryption or offboarding protocols, violating 16 C.F.R. §314.4 (Exhibits B, C, E).

49. Plaintiff retained customer data post-termination due to Defendants' failures (Exhibits C, E).

50. On March 20, 2025, Plaintiff identified a breach of Customer X's (retention) financial data on unsecured devices (Exhibit E).

51. Plaintiff notified Blalock on March 24, 2025, who failed to act, stating, "let me get back to you on that" (Exhibit E).

52. These failures breached DSA §6.01 and constitute unfair/deceptive practices under N.C. Gen. Stat. §75-1.1. It is reasonable to request Leaf to take steps to protect customer data.

## H. Discriminatory Practices (Title VII)

53. In 2023–2024, Manager Chris Oakley (Minister) forced mandatory prayer at meetings, coercing Plaintiff's participation and creating a hostile environment (Exhibit B).

54. In February 2024, Oakley denied training to Plaintiff's Black colleague, Rayquan, while offering it to non-Black peers, supporting racial discrimination (Exhibit B).

55. Plaintiff filed an EEOC charge on September 6, 2024, seeking tolling pending his Right to Sue letter (Exhibit C).

**I. Harm Resulting from Unlawful Conduct**

56. Plaintiff suffered ~$10,000 in lost wages and commissions, a $7,667.68 IRS tax penalty for 2021, reputational harm, and emotional distress (anxiety, sleep disruption) (Exhibits C, E).

# VI. LEGAL CLAIMS

**Count 1 – Retaliation Under the False Claims Act (31 U.S.C. §3730(h))**

57. Plaintiff incorporates by reference all preceding paragraphs (¶¶1–56), Exhibits A–F, and the prior case record (Case No. 1:24-CV-824-CCE-JEP, Docket No. 5) as if fully set forth herein.

58. Plaintiff engaged in protected activity under 31 U.S.C. §3730(h) by reporting internally that Defendants' invocation of IRC §3508 in DSA §4.01 was materially misleading, falsely asserting federal authority to impose $50-per-day penalties and misclassify workers as independent contractors. This misrepresentation resulted in false 1099 filings and evasion of payroll tax obligations, defrauding the U.S. Treasury, as evidenced by Plaintiff's $7,667.68 penalty (Exhibit C). Such internal reporting constitutes protected activity under *United States ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 200 (4th Cir. 2018), because it sought to stop fraud against the government and exposed conduct that could support a viable FCA action.

59. On April 14, 2024, Plaintiff disclosed these concerns to Leaf Agent Brian Swan, comparing DSA §4.01 to the true text of IRC §3508, intending to prevent FCA violations, activity protected even absent formal government filing (Exhibit E).

60. Within 24 hours, on April 16, 2024, Defendants terminated Plaintiff, citing "failure to report to work" and "unreachability" despite Plaintiff's April 15, 2024 contact—later contradicted by Swan's recharacterization of the separation as a "resignation" (Exhibit F).

61. These inconsistent and pretextual explanations support an inference of retaliatory motive.

13

Plaintiff seeks reinstatement, double back pay (approximately $20,000), interest, special damages, and such further relief as permitted under 31 U.S.C. §3730(h).

## Count 2 – Declaratory Judgment (28 U.S.C. §2201)

62. Plaintiff incorporates by reference all preceding paragraphs, Exhibits A–F, and the prior case record (Case No. 1:24-CV-824-CCE-JEP, Docket No. 5) as if fully set forth herein.

63. An actual controversy exists regarding the enforceability of DSA §4.01, which falsely invokes IRC §3508 to prohibit workers from challenging misclassification, imposing unlawful $50-per-day penalties and fee-shifting provisions (Exhibit A).

64. These contractual provisions, unsupported by federal law, unlawfully chill rights protected by the Fair Labor Standards Act and mislead workers regarding available remedies, as confirmed by Defendants' counsel Joseph Blalock (Exhibit B). The clause is also void under the Supremacy Clause of the U.S. Constitution because IRC §3508 does not authorize private penalties or fee-shifting, and any state or private contract law purporting to impose such terms is federally preempted.

65. Plaintiff seeks a declaratory judgment that DSA §4.01 is void, preempted, and unenforceable and that Plaintiff was misclassified and entitled to FLSA protections.

## Count 3 – Breach of Contract

66. Plaintiff incorporates by reference all preceding paragraphs, Exhibits A–F, and the prior case record (Case No. 1:24-CV-824-CCE-JEP, Docket No. 5) as if fully set forth herein.

67. The Direct Seller Agreement required 30 days' written notice prior to termination without cause (DSA §9.02) and compliance with consumer data security obligations (DSA §6.01 "Reasonable Requests").

14

68. Defendants breached these obligations by terminating Plaintiff on April 16, 2024, without notice (Exhibit F) and by failing to implement proper data security measures, leading to the unauthorized post-termination retention of Customer X's financial information in March 2025 (Exhibit E).

69. As a result, Plaintiff suffered approximately $10,000 in lost wages, a $7,667.68 IRS tax penalty (Exhibit C), and reputational harm associated with insecure client data handling. Plaintiff seeks compensatory damages, interest, and all other contractual remedies available.

## Count 4 – Wrongful Discharge in Violation of North Carolina Public Policy

70. Plaintiff incorporates by reference all preceding paragraphs, Exhibits A–F, and the prior case record (Case No. 1:24-CV-824-CCE-JEP, Docket No. 5) as if fully set forth herein.

71. Defendants terminated Plaintiff on April 16, 2024, after he reported misclassification under DSA §4.01, data security violations under DSA §6.01, and racial and religious workplace discrimination, all matters of public concern (Exhibit E).

72. This termination violated North Carolina public policy as reflected in the Retaliatory Employment Discrimination Act (N.C. Gen. Stat. §95-240) and the Equal Employment Practices Act (N.C. Gen. Stat. §143-422.1), which protect employees and misclassified workers who report practices endangering public welfare, including the mishandling of consumer data (Exhibit E).

73. Plaintiff seeks compensatory damages, punitive damages (approximately $20,000; ¶56), interest, and all other relief available under North Carolina law.

## Count 5 – Violations of the Fair Labor Standards Act (29 U.S.C. §201 et seq.)

74. Plaintiff incorporates by reference all preceding paragraphs, Exhibits A–F, and the prior case

15

record (Case No. 1:24-CV-824-CCE-JEP, Docket No. 5) as if fully set forth herein.

75. Defendants willfully misclassified Plaintiff as an independent contractor under DSA §4.01 to avoid paying minimum wage and overtime compensation as required by 29 U.S.C. §§206–207 (Exhibit A).

76. Despite the "contractor" label, Plaintiff was subject to controlled scheduling, mandatory training, branded attire requirements, and direct supervision by Ops Managers (Exhibit D), satisfying the FLSA definition of an employee under 29 U.S.C. §203(g) (¶35; Exhibit D).

77. On April 14, 2024, Plaintiff reported misclassification and unsafe consumer data practices to Leaf management. Defendants terminated Plaintiff within 24 hours, in violation of FLSA's anti-retaliation provision, 29 U.S.C. §215(a)(3) (Exhibits E–F).

78. Plaintiff seeks approximately $10,000 in unpaid wages and overtime, liquidated damages, back pay, front pay, reinstatement, and attorneys' fees and costs under 29 U.S.C. §216(b).

**Count 6 – Unfair and Deceptive Trade Practices (N.C. Gen. Stat. §75-1.1)**

79. Plaintiff incorporates by reference all preceding paragraphs, Exhibits A–F, and the prior case record (Case No. 1:24-CV-824-CCE-JEP, Docket No. 5) as if fully set forth herein.

80. Defendants LeafFilter North, LLC and related Leaf Entities engaged in unfair and deceptive acts and practices in or affecting commerce by:

(a) Misrepresenting Internal Revenue Code §3508 within DSA §4.01 to fabricate a false "3508 Direct Seller" category, deterring classification challenges through coercive penalties, as admitted by Defendants' counsel Joseph Blalock (Exhibit B).

(b) Deceiving consumers by outfitting misclassified workers with LeafFilter uniforms, "Commercial Accounts Manager" business cards, and branded mobile applications (Exhibit D), falsely implying corporate oversight and enterprise level secure data handling protocols.

16

(c) Directing workers to collect sensitive consumer information—including bank account numbers, routing information, images of credit applications, signed contracts, and home photographs—on unsecured personal devices and unencrypted third-party applications, in violation of the FTC Safeguards Rule, 16 C.F.R. §314.4, and DSA §6.01 (Exhibit B, E).

(d) Failing to respond to Plaintiff's March 24, 2025 report of a live consumer data breach involving Customer X's financial records; Defendants' counsel replied only, "let me get back to you," and took no corrective action, compounding harm to both consumers and Plaintiff (Exhibit E).

81. These willful acts, constituting per se violations of 16 C.F.R. §314.4, misled over one million consumers into disclosing sensitive information, unlawfully shifted non-delegable regulatory duties onto workers, concealed systemic risks from consumers and regulators, and distorted lawful competition, substantially affecting interstate commerce (Exhibit B, E).

82. As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiff suffered:

(a) A $7,667.68 IRS tax penalty (Exhibit C).

(b) Approximately $10,000 in lost wages and commissions.

(c) Reputational harm from association with insecure data practices (Exhibit E).

(d) Emotional distress resulting from professional liability exposure and retaliation (Exhibit E).

83. Plaintiff respectfully requests treble damages under N.C. Gen. Stat. §75-16, injunctive relief requiring Defendants to implement FTC-compliant centralized data protections and purge protocols, attorneys' fees under N.C. Gen. Stat. §75-16.1, and such other and further relief as the Court deems just and proper.

**Count 7 – Discrimination and Retaliation Under Title VII (42 U.S.C. §2000e et seq.)**

84. Plaintiff incorporates by reference all preceding paragraphs, Exhibits A–F, and the prior case record (Case No. 1:24-CV-824-CCE-JEP, Docket No. 5) as if fully set forth herein.

85. From 2023 to 2024, Defendants subjected Plaintiff to religious discrimination by mandating weekly prayer sessions led by Manager Chris Oakley, pressuring non-Christian conformity and creating a hostile work environment (Exhibit B).

86. In February 2024, Defendants engaged in racial discrimination when Oakley denied sales training to Plaintiff's Black colleague, Rayquan, while providing it to non-Black employees, constituting disparate treatment based on race (Exhibit B).

87. Plaintiff reported these discriminatory practices internally to Leaf Agent Brian Swan in March 2024 and was terminated on April 16, 2024, within weeks of his protected complaints (Exhibits E–F).

88. These actions violated Title VII, 42 U.S.C. §2000e-2(a), causing Plaintiff emotional distress, professional harm, and approximately $10,000 in lost wages and commissions (¶56).

89. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on September 6, 2024, seeking equitable tolling pending issuance of a Right to Sue letter (Exhibit C).

90. Plaintiff seeks compensatory damages, punitive damages, equitable relief, and all other remedies available under Title VII to redress this human toll.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court declare DSA §4.01 void and unenforceable and find Plaintiff was misclassified and entitled to employee protections; enjoin

Defendants from unlawful practices, require data security compliance under 16 C.F.R. §314.4, and refer such practices to the Federal Trade Commission for consideration under its statutory mandate; award compensatory damages for lost wages, commissions, tax liabilities ($7,667.68), emotional distress, and reputational harm; grant statutory damages including FLSA liquidated damages, FCA double back pay, and UDTPA treble damages; award punitive damages where authorized; order reinstatement or front pay in lieu thereof; award costs and attorneys' fees where permitted; grant leave to amend upon receipt of the EEOC Right to Sue letter or to assert class claims; and provide such other and further relief as the Court deems just and proper.

## VIII. REQUEST FOR BENCH TRIAL

Plaintiff respectfully requests a bench trial under Fed. R. Civ. P. 39(b) due to the complex statutory, contractual, and regulatory issues presented, including intricate tax, labor, and data security violations alleged, which implicate fundamental rights and protections. Plaintiff knowingly waives a jury trial under Fed. R. Civ. P. 38 to promote judicial efficiency and conserve this Court's resources, in deference to the Court's March 17, 2025, order permitting a new, rule 11 compliant lawsuit. This choice reflects Plaintiff's commitment to a clear, expeditious resolution, minimizing burden on the Middle District of North Carolina while preserving the substantive merits of his claims.

## IX. CERTIFICATION

Pursuant to Fed. R. Civ. P. 11(b), Plaintiff certifies this Complaint is presented in good faith, warranted by law, and supported by evidence.

## X. CERTIFICATE OF SERVICE

Plaintiff will serve this Complaint and Exhibits via USPS Certified Mail, Return Receipt Requested, to LeafFilter North, LLC's registered agent at 1160 Dublin Road, Suite 400, Columbus, OH 43215, per Fed. R. Civ. P. 4(h)(1)(B) and M.D.N.C. Local Rule 4.1.

Dated: April 30, 2025

Respectfully submitted,

George Platt,
Plaintiff, Pro Se Litigant
6400 Old Oak Ridge Rd, Apt E-16
Greensboro, NC 27410
Phone: (571) 379-3111
Email: George.platt62@gmail.com

# Footnotes

1. **Title VII – Right to Sue Letter Pending**
   Plaintiff filed an EEOC charge on September 6, 2024, alleging a religiously hostile work environment (compulsory prayer sessions) and racial discrimination (denial of training to a Black colleague, Rayquan), under 42 U.S.C. §2000e-2(a). As of this filing, Plaintiff has not received a Right to Sue letter and asserts this claim conditionally, seeking tolling and leave to amend per 42 U.S.C. §2000e-5(f)(1) and *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).

2. **Preservation of Class and Collective Action Rights**
   Plaintiff does not presently move for certification but preserves rights under Fed. R. Civ. P. 23 (state-law claims) and 29 U.S.C. § 216(b) (FLSA). The proposed Direct Seller class, as reflected in Exhibit D's nationwide job postings, presents common issues of law and fact capable of generating class-wide resolutions, consistent with the Fourth Circuit's interpretation of Rule 23(a)(2). Plaintiff further notes that the proposed class is sufficiently specific and not overly broad to support certification when sought.

20

3. **Data Breach – Post-Termination Retention**
   Customer X's March 2025 voicemail, received nearly a year after Plaintiff's April 2024 termination, underscores LeafFilter's failure to purge consumer data post-engagement, violating DSA §6.01 and 16 C.F.R. §314.4 by lacking post-separation security protocols.

4. **Retaliation – EEOC and IRS Activity**
   Defendants' March 2025 "impasse" response followed Plaintiff's EEOC charge (Sept. 6, 2024) and IRS Form SS-8 filing (Jan. 9, 2025), evidencing retaliation for protected activity under 29 U.S.C. §215(a)(3) and 31 U.S.C. §3730(h).

5. **Exhibit E – Private Correspondence Clarification**
   The March–April 2025 emails in Exhibit E are private correspondence not filed in Case No. 1:24-CV-824-CCE-JEP. They are preserved in original form and available upon judicial request or through discovery.

# Exhibit Table of Contents

Exhibits Overview: Description and Relevance............................................22

Exhibit A – DSA §4.01 vs. IRC §3508..........................................................25

Exhibit B – Defense Counsel Admissions & Position Statement..................28

Exhibit C – IRS SS-8 Filing, CP40 Notice, Classification Tests..................34

Exhibit D – Nationwide Job Postings............................................................42

Exhibit E – March–April 2025 Email Chain (Data Breach, Retaliation) ......44

Exhibit F – Termination Communications......................................................47

Case 1:25-cv-00332     Document 1     Filed 04/30/25     Page 26 of 54

# EXHIBITS   Overview/Description/Relevance

**Exhibit A – Comparison of DSA §4.01 and IRC §3508 Page 25** Description: Direct comparison of Leaf's altered version of IRC §3508, as embedded in §4.01 of its Direct Seller Agreement (DSA), with the actual statutory text. §4.01 imposes a $50-per-day penalty and fee-shifting clause for workers who challenge their classification—penalties not authorized by IRC §3508. Defendants presented this clause as federally supported, anchoring Plaintiff's claims of statutory misrepresentation, preemption, and retaliatory misuse of tax law.

**Exhibit B – Leaf Position Statement (Blalock) Page 28** Description: Formal position statement of Leaf, affirmed by Senior legal agent Joseph Reiner Blalock. The statement concedes there is no statutory or internal support for DSA §4.01's penalty clause under IRC §3508. It further acknowledges deficient data handling protocols and offers to revise the DSA if Plaintiff agreed—without offering remediation. These attorney-authenticated admissions (Fed. R. Evid. 801(d)(2)) directly support Plaintiff's claims for deliberate misrepresentation, breach of contract, and willful noncompliance with data security obligations.

**Exhibit C – IRS SS-8 Submission and Classification Analysis Page 34** Description: Plaintiff's January 9, 2025, SS-8 submission to the IRS, confirmed scanned into the IRS compliance system on March 10, 2025. Includes CP40 response and parallel analyses under the IRS 20-Factor and DOL Economic Reality tests. Documents a $7,667.68 tax liability imposed on Plaintiff as a direct result of Leaf's worker misclassification, and supports statutory claims under the FLSA, FCA, and Plaintiff's demand for declaratory relief.

**Exhibit D – Job Advertisements Page 42** Description: Nationwide job postings issued by Leaf defining the role of a "3508 Direct Sales Representative" across all divisions. The postings impose non-negotiable, employee-style obligations—mandatory meetings, fixed schedules, prescribed sales scripts, and close managerial oversight—while expressly denying employee classification. These materials demonstrate a self-created labor category operating under the guise of IRC §3508 authorities and are cited throughout Exhibit C's agency classification analysis. Directly supports misclassification claims under federal and state law.

**Exhibit E – Email Exchange with Leaf Counsel (March–April 2025) Page 44** Description: Email chain excerpts between Plaintiff and Leaf's lead counsel documenting Plaintiff's March 24, 2025, report of a live consumer data breach involving retained financial information. Defense counsel's response—"we are at impasse… happy to wait for service"— and "Let me get back to you on that" confirms exhaustion of private remedy and a refusal to remediate or instruct. Supports Plaintiff's claims for retaliation, negligent data practices, and breach of contract under DSA §6.01 and the FTC Safeguards Rule.

## Exhibit F – Termination Correspondence (April 2024) Page 47

2 emails from Brian Swan dated April 16 and April 23, 2024, which, taken with his April 15 phone call, establish a clear temporal nexus between Plaintiff's protected disclosures and retaliatory termination. On that call, Swan acknowledged Plaintiff's misclassification and compliance concerns and said he would speak with Operations Manager Chris Oakley the next day. On April 16—less than 24 hours later—Plaintiff was locked out of LeafFilter systems and received Swan's 11:16 a.m. email stating his "contract was eliminated" due to "unreachability," despite having just spoken with Swan the day prior. The message disclaimed HR involvement

and denied any link to Plaintiff's complaints, while noting the investigation remained "ongoing." One week later, on April 23, Swan, now writing on behalf of Leaf's legal team, recharacterized the immediate April 16, 2024 termination as Plaintiff's "resignation" and invoked DSA confidentiality provisions. These contradictory and unsupported justifications—issued days after protected activity—support a strong inference of retaliatory motive, post hoc narrative revision, and pretext under the FCA, FLSA, and North Carolina public policy.

# Exhibit A

This is the operative clause 4.01 in the LeafFilter Direct Seller Agreement

**4.01 IRC §3508**: Pursuant to Internal Revenue Code §3508, Direct Seller will not be treated as an employee, with respect to Services, for Federal tax purposes. **DIRECT SELLER AGREES THAT HE WILL NOT, AT ANY TIME DURING OR FOLLOWING HIS RELATIONSHIP WITH COMPANY, CONTEST THIS SECTION AND THIS UNDERSTANDING BETWEEN THE PARTIES. DIRECT SELLER FURTHER AGREES THAT IF HE VIOLATES THIS SECTION AND THIS PROMISE, UPON WHICH COMPANY IS RELYING IN ENGAGING DIRECT SELLER, DIRECT SELLER WILL BE IN BREACH OF THIS AGREEMENT AND WILL PAY TO COMPANY LIQUIDATED DAMAGES OF $50 PER DAY FOR EACH DAY WHICH DIRECT SELLER IS IN BREACH OF THESE COVENANTS AS WELL AS COMPANY'S REASONABLE ATTORNEY'S FEES IN DEFENDING THIS RELATIONSHIP TO ANY STATE OR FEDERAL AGENCY DUE TO DIRECT SELLER'S ACTIONS.**

**4.02. Taxes**: Neither federal, state, local income, unemployment, nor payroll tax of any kind shall be paid by Company on behalf of Direct Seller as Direct Seller will not be treated as an employee under federal, state, local income, unemployment, or payroll tax laws. Direct Seller understands that Direct Seller is responsible to pay Direct Seller's income and other taxes.

This is the actual US IRC3508:

§ 3508. Treatment of real estate agents and direct sellers (a) General rule for purposes of this title, in the case of services performed as a qualified real estate agent or as a direct seller— (1) the individual performing such services shall not be treated as an employee, and (2) the person for whom such services are performed shall not be treated as an employer. (b) Definitions For purposes of this section— (1) Qualified real estate agent The term "qualified real estate agent" means any individual who is a sales person if— (A) such individual is a licensed real estate agent, (B) substantially all of the remuneration (whether or not paid in cash) for the services performed by such individual as a real estate agent is directly related to sales or other output (including the performance of services) rather than to the number of hours worked, and (C) the services performed by the individual are performed pursuant to a written contract between such individual and the person for whom the services are performed and such contract provides that the individual will not be treated as an employee with respect to such services for Federal tax purposes. (2) Direct seller The term "direct seller" means any person if— (A) such person— (i) is engaged in the trade or business of selling (or soliciting the sale of) consumer products to

any buyer on a buy-sell basis, a deposit-commission basis, or any similar basis which the Secretary prescribes by regulations, for resale (by the buyer or any other person) in the home or otherwise than in a permanent retail establishment, (ii) is engaged in the trade or business of selling (or soliciting the sale of) consumer products in the home or otherwise than in a permanent retail establishment, or (iii) is engaged in the trade or business of the delivering or distribution of newspapers or shopping news (including any services directly related to such trade or business), (B) substantially all the remuneration (whether or not paid in cash) for the performance of the services described in subparagraph (A) is directly related to sales or other output (including the performance of services) rather than to the number of hours worked, and (C) the services performed by the person are performed pursuant to a written contract between such person and the person for whom the services are performed and such contract provides that the person will not be treated as an employee with respect to such services for Federal tax purposes. (3) Coordination with retirement plans for selfemployed This section shall not apply for purposes of subtitle A to the extent that the individual is treated as an employee under section 401(c)(1) (relating to self-employed individuals). (Added Pub. L. 97–248, title II, §269(a), Sept. 3, 1982, 96 Stat. 551; amended Pub. L. 104–188, title I, §1118(a), Aug. 20, 1996, 110 Stat. 1764.) AMENDMENTS
1996—Subsec. (b)(2)(A). Pub. L. 104–188 added cl. (iii). EFFECTIVE DATE OF 1996 AMENDMENT Section 1118(b) of Pub. L. 104–188 provided that: ''The amendments made by this section shall apply to services performed after December 31, 1995.'' EFFECTIVE DATE Section 269(e) of Pub. L. 97–248 provided that: ''(1) IN GENERAL.—Except as provided in paragraph (2), the amendments made by this section[enacting this section and amending section 410 of Title 42, The Public Health and Welfare] shall apply to services performed after December 31, 1982. ''(2) SUBSECTION (c).—The amendments made by subsection (c) [amending provisions set out as a note under section 3401 of this title] shall take effect on July 1, 1982.'' RULES AND REGULATIONS Section 269(c)(3) of Pub. L. 97–248 provided that: ''Nothing in section 530 of the Revenue Act of 1978 [set out as a note under section 3401 of this title] shall be construed to prohibit the implementation of the amendments made by this section [enacting this section, amending section 410 of Title 42, The Public Health and Welfare, and amending provisions set out as a note under section 3401 of this title].'' § 3509. Determination of employer's liability for certain employment taxes (a) In general If any employer fails to deduct and withhold any tax under chapter 24 or subchapter A of chapter 21 with respect to any employee by reason of treating such employee as not being an employee for purposes of such chapter or subchapter, the amount of the employer's liability for— (1) Withholding taxes Tax under chapter 24 for such year with respect to such employee shall be determined as if the amount required to be deducted and withheld were equal to 1.5 percent of the wages (as defined in section 3401) paid to such employee. (2) Employee social security tax Taxes under subchapter A of chapter 21 with respect to such employee shall be determined as if the taxes imposed under such

Case 1:25-cv-00332    Document 1    Filed 04/30/25    Page 31 of 54

subchapter were 20 percent of the amount imposed under such subchapter without regard to this subparagraph.

**Note:** No portion of IRC § 3508 authorizes any form of private penalty, waiver of legal status challenge, or shifting of litigation costs. Full DSA available in Case No. 1:24-CV-00824-CCE-JEP, Docket No. 5, Exhibit 2

**Certification of Statutory Accuracy: IRC §§ 3508**

The provided text of IRC § 3508 accurately reflects current law: qualified real estate agents and direct sellers are not considered employees for federal tax purposes, and their clients are not treated as employers. Definitions and criteria remain unchanged since the 1996 amendment, with original provisions effective in 1982. Both FindLaw and Bloomberg Tax confirm this version, noting only minor editorial updates without affecting substance.

27

# Exhibit B

**Blalock, Joseph** <JBlalock@beneschlaw.com>

Fri, Dec 20, 2024, 11:33 AM

to me, Michael

George, see my comments in red below. I have not touched on all your points for several reasons. So, when you read my comments in red, don't assume that Leaf's silence as to any of your purported factual assertions, characterizations of Leaf's business, or characterizations of the law, the underlying record, or statements or factual assertions made by Leaf's counsel at any point in time is intended as an admission of any kind.

Joseph Reiner Blalock
Senior Managing Associate | Labor & Employment
Benesch Friedlander Coplan & Aronoff LLP

t: 614.223.9359 | m: 304.218.9497 | f: 614.223.9330
JBlalock@beneschlaw.com | www.beneschlaw.com

41 South High Street, Suite 2600, Columbus, OH 43215-6164
44 15th Street, Suite 2, Wheeling, WV 26003

Confidentiality Notice to Incorrect Addressee: www.beneschlaw.com/confidentialitynotice

Bio

**From:** George Platt <george.platt62@gmail.com>
**Sent:** Monday, December 16, 2024 8:57 AM
**To:** Blalock, Joseph <JBlalock@beneschlaw.com>
**Subject:** Re: 1:24-cv-00824-CCE-JEP PLATT v. LEAFFILTER NORTH LLC - Correspondence

### Subject: Follow-Up on Our Call

Good morning Joseph,

Thank you again for taking the time to speak with me last week. I appreciated the opportunity to engage directly and exchange perspectives. Conversations like this are an essential step toward narrowing the matters at hand and ensuring clarity on key issues.

In my previous email, I mentioned my intention to send updates on the 17th. However, after our discussions, I believe it is more productive to delay these updates for now. This decision reflects my commitment to working collaboratively toward a resolution and ensuring that any information I share is both accurate and comprehensive.

That said, several critical concerns remain unresolved, and I would like to clarify them further and invite your input. To provide a clear framework, I will address these matters in four parts:

28

Case 1:25-cv-00332    Document 1    Filed 04/30/25    Page 33 of 54

(1) Procedural Issues and the Duty of Candor, (2) The Use of IRC §3508 and Its Impact on Worker Classification, (3) Data Security and Compliance Failures, and (4) Personal Experiences Illustrating Systemic Flaws. I will then conclude with a request for documentation and transparency that, I believe, can help us move toward a more constructive resolution.

## 1. Procedural Issues and the Duty of Candor

With regard to the motion for delay, the timeline inconsistencies and shifting justifications are now on the public record in PACER. These discrepancies undermine the stated reasons for seeking the delay and raise serious questions about the accuracy of the representations made to the court. They are objectively verifiable, and I encourage your team to review them carefully.

To assist in this, I suggest uploading the motion filed by Mr. Dedman, my opposition, and the accompanying email chain into an analysis platform and posing the following inquiry:

"Read the motion for an extension of time, the opposing response, and the accompanying email chain. Identify all timeline inconsistencies, shifting or contradictory arguments, selective omissions, and procedural conduct that could support a claim of bad faith or sanctions, citing specific examples from the documents."

The facts will speak for themselves. As officers of the court, your team is duty-bound to ensure that all pleadings and representations are accurate and supported by the record. Now that these inconsistencies have been brought to your attention, this is an opportunity to amend or cure the record as we move forward. Doing so would not only address these concerns but also help set a constructive tone for resolving the remaining issues.

Hello George, not sure I follow you here. My recollection is Leaf only filed one motion in the now dismissed case that you originally filed under seal. I reviewed that motion not 5 minutes ago – the one where we sought a brief extension of time to respond to your initial pleadings that you filed under seal. We only filed that motion because, ultimately, you would not extend us the courtesy the extension we sought absent other conditions. In short, there is no need to correct or cure the motion or the record.


## 2. A Thoughtful Look at IRC §3508 and Worker Classification

IRC §3508 was enacted with a narrow, targeted purpose: clarifying tax treatment for certain workers, such as real estate agents and direct sellers. It was never intended to carve out an entirely new labor category exempt from established worker protections. Nor was it designed to override laws like the Fair Labor Standards Act (FLSA), the Civil Rights Act, or federal rules governing data security. Rather, §3508 must be applied in a way consistent with the statute's limited purpose and the broader network of federal labor standards and consumer protections.

At LeafFilter, however, §3508 appears to have been stretched far beyond its intended scope. The company relies on this tax provision to classify individuals as independent contractors even when core operational practices reflect an employer-employee relationship. Consider LeafFilter's job postings for positions like outside sales representatives and operations managers. These postings set forth requirements such as:

- Mandatory attendance at company meetings

29

- Direct supervision by branch managers
- Adherence to company-issued scripts
- Use of company-provided tools and pre-qualified leads
- Full-time availability for same-day appointments

Under the Department of Labor's six-factor "economic realities" test and the IRS's 20-factor test, these conditions overwhelmingly suggest employer control—hallmarks of true employment rather than independent contracting. When workers must adhere so closely to company directives, the notion that they are independent contractors grows increasingly difficult to reconcile with federal standards.

This tension is not limited to the classification issue alone. The company's interpretation of §3508 appears to be a linchpin allowing it to evade multiple layers of legal responsibility, creating a troubling paradox. How, for instance, does a tax provision designed to clarify employment status for certain sellers empower the company to:

- Impose a $50/day liquidated damages clause that penalizes workers for even questioning their classification?
- Terminate a contractor without adhering to the contractual notice requirement in the DSA, effectively treating them as an at-will employee?
- Ignore FTC Safeguards Rule obligations concerning data security, leaving sensitive customer information unsecured?
- Mandate attendance at denominational religious services, despite the implications for religious freedom and anti-discrimination standards?
- Withhold necessary training from Black sales representatives, disregarding the basic civil rights protections that should govern all workplace relationships?

Nothing in §3508's text suggests it was designed to grant employers the right to impose employee-like obligations while simultaneously stripping workers of employee protections, including nondiscrimination requirements and data security standards. By attempting to use §3508 as a shield, LeafFilter risks fundamentally misapplying a tax statute to justify practices that contravene established labor and consumer protection laws.

During our conversation, you mentioned that LeafFilter relies on specific rulings and agency guidance to support this approach. While agency interpretations may provide helpful context, they cannot replace the judiciary's role as the ultimate authority in interpreting statutory meaning—particularly in a post-Chevron landscape where courts have the final word on whether a statute is being applied as Congress intended. If §3508 is being used in ways that extend beyond its original legislative purpose, the proper venue to resolve such concerns is a federal district court.

To better understand the company's position, I respectfully request documentation or guidance that explicitly supports LeafFilter's claim that §3508 lawfully enables the practices at issue— such as classifying workers under conditions resembling employment, imposing penalties,

circumventing data security obligations, mandating religious attendance, and denying equal training opportunities.

As part of our agreement, I relied on LeafFilter's commitment to engage meaningfully on these matters when I withdrew my motion for a preliminary injunction. Providing this documentation prior to our scheduled call this Friday is an important step in fulfilling that commitment. If the materials are not provided, it would raise significant concerns regarding compliance with the terms of our agreement and leave me no choice but to evaluate the available remedies, including the potential to seek both injunctive and declaratory relief through the courts.

I emphasize that my intent is not to escalate unnecessarily, but to seek clarity and resolution. My goal remains to ensure that statutes like §3508 are applied in a way that aligns with their legislative purpose and the fundamental protections guaranteed under federal law. A constructive exchange would be the preferred path forward. However, if meaningful engagement does not materialize, judicial review may become the necessary avenue to bring clarity and accountability to these issues.

George, Leaf already agreed not to enforce the liquidated damages and attorney fees provision in your agreement. There isn't anything else regarding "§3508" to discuss (other than what's below).

### 3. Data Security and Compliance: Addressing a Critical Vulnerability

LeafFilter's handling of sensitive customer information reveals another significant compliance failure, this time under the FTC Safeguards Rule (16 C.F.R. § 314.4). Although the company claims to have served over one million customers, it has not implemented secure, company-controlled systems to protect their personal and financial data. Instead, this data is collected and transmitted through contractors' personal devices—unsecured phones, personal emails, texting apps, and scanning tools like CamScanner—leaving sensitive documents such as credit applications, checks, and IDs unencrypted, unpurged, and entirely beyond LeafFilter's direct oversight.

The FTC Safeguards Rule mandates policies, procedures, and controls to prevent unauthorized access, including encrypting data both at rest and in transit. LeafFilter's current practices flagrantly contradict these requirements. The company's assurance that it "hasn't had a problem" misses the point: the rule requires proactive safeguards, not after-the-fact justifications. Failing to secure customer data leaves at least one million individuals—many of them older adults especially susceptible to identity theft—at ongoing risk.

LeafFilter can address these vulnerabilities by:

- **Implementing Secure, Centralized Systems:** Move data management in-house, with robust encryption and strict access controls.

- **Ensuring Proper Encryption and Monitoring:** Encrypt data at every stage and establish continuous oversight for unauthorized activity.

- **Adopting Formal Retention and Deletion Policies:** Retrieve and secure data currently on personal devices, then implement standardized retention and purging protocols going forward.

31

- **Providing Secure Tools and Training:** Equip contractors with approved platforms and thorough training, eliminating reliance on personal devices and ad hoc methods.

While I lack a private right of action under the FTC Safeguards Rule, I can still bring these risks to the attention of advocacy groups, regulatory bodies, or the public if necessary. These protections exist for the public good, ensuring that companies fulfill their moral and legal obligation to protect the individuals who trust them.

Understood.

## 4. Personal Experience as Evidence of Systemic Flaws

My firsthand experiences with LeafFilter reveal how systemic flaws manifest in the workplace. On my very first day at the Greensboro office, I witnessed Rayquan, a Black colleague that I was told had been employed for six months, being denied essential training on critical data safety tools. His lack of preparation was not a mere oversight but a glaring instance of discrimination that left him professionally vulnerable and jeopardized customer data security. Despite his efforts, he was ultimately terminated.

The troubling practices did not end there. Chris Oakley, a minister, and the branch operations manager, conducted mandatory religious services before sales meetings, offering no option to opt out. As someone committed to respecting religious freedoms, I found this not only inappropriate but a clear violation of basic workplace rights. Additionally, I was instructed to handle sensitive customer data through unsecured personal channels—using personal phones, unencrypted emails, and third-party scanning apps. These directives blatantly violated the FTC Safeguards Rule, exposing customers' financial and personal information to significant risk.

Guided by my ethical, legal, and religious principles, I submitted a 30-day resignation notice under the DSA, aiming to give the company an opportunity to address these systemic failures and protect customers and employees alike. During this time, I maintained open communication with corporate leadership, hoping for meaningful action to resolve the issues and allow me to return to my duties. Instead, retaliation ensued. After Brian Swan disclosed my concerns to Oakley, I was immediately locked out of company systems, in violation of the DSA's notice requirements. Shortly thereafter, I was terminated for being "unreachable," despite having spoken with Swan by phone the day prior. Swan was the one who sent the termination email.

These events exemplify the dangers of abusing IRC §3508 to exert employer-like control while avoiding the protections afforded to traditional employees. Workers under such conditions are subject to discrimination, unsafe practices, and retaliation, bearing all the burdens of employment without the corresponding safeguards or recourse.

George, on this front, if Leaf stopped including the liquidated damages and attorneys' fees provision in its outside seller agreements, would that satisfy you?

## Closing Request: Seeking Transparency and Accountability

During our conversation, you stated that the company relies on specific rulings and agency guidance to justify its practices under IRC §3508. To better understand LeafFilter's position,

please provide the documentation supporting the claim that this classification allows the company to:

- Require mandatory attendance to denominational religious services,

- Ignore the FTC Safeguards Rule regarding data security,

- Refuse to train Black sales representatives,

- Disregard protections under the Civil Rights Act, and

- Terminate, without notice, workers who engage in protected speech by raising concerns internally.

It would be helpful to receive these materials prior to our scheduled call this Friday. Such transparency will help ensure that all parties operate with a shared understanding of the statutory framework.

George, to my knowledge, Leaf cannot produce documents supportive of the claim that IRC §3508 permits employers to take the kind of action or inaction described in your give (5) bullet points directly above. That's because, to my knowledge, no such documents exist anywhere.

This is not solely about me; it concerns a system impacting thousands of workers and countless customers who rely on LeafFilter's integrity. The record of these events is clear and unrefuted, and the broader issue is the misuse of §3508 to create a labor category unsupported by statute, enabling companies to exploit workers while avoiding their legal obligations.

I do not seek notoriety or an exorbitant settlement. I am willing to consider a modest and reasonable resolution if it leads to meaningful compliance and better protections. However, if LeafFilter continues to delay, diminish, or avoid these issues, I am prepared to escalate, whether by seeking judicial review or raising public awareness. While I would prefer a collaborative outcome, I will make use of my limited remedies if it becomes necessary.

My hope is that by addressing these issues—through transparency, accountability, and reform— we can ensure that §3508 is applied as Congress intended and that workers, customers, and the public receive the fairness, safety, and respect they deserve.

Sincerely,

George Platt

**Exhibit C My response to IRS Notice CP 40 received 12/29/2024, Scanned into IRS compliance system 03/10/2025**

**Sent to:**

Internal Revenue Service/Specialized Compliance
Stop P-4 5050
P.O. Box 219236
Kansas City, MO 64121-9236

Internal Revenue Service/Specialized    Compliance
1973 N. Rulon White Blvd.
Ogden, UT 84201

**Subject:** Request for Review of Tax Liability in the Context of Worker Misclassification
To Whom It May Concern,

I am writing regarding a recent notice of tax liability for $7,667.68 for the 2021 tax year, which I first became aware of on December 30, 2024, upon receiving IRS Notice CP40. I immediately contacted CBE Group, and they told me they would arrange to have this issue returned to your department to resolve. This liability arose during the height of the pandemic when I was classified as a Direct Seller under IRC §3508 while working as a sales representative for LeafFilter North LLC.

At the same time, I was pursuing an entrepreneurial endeavor related to a recent allowance from the U.S. Patent Office for an existing patent. The project, which is viewable at LeafHome.io, intends to address inefficiencies in the home improvement industry through sustainable, modular manufacturing techniques. Unfortunately, the attempt to launch the project was a debacle. Between startup costs, disputes over professional services, and legal fees, my expenses during that period were substantial and likely understated in my prior filings. These financial burdens, compounded by my misclassification as an independent contractor at LeafFilter, contributed directly to my unexpected tax liability for the 2021 tax year.

Additionally, my ability to address this liability has been compromised by my termination from LeafFilter in April 2024, which I believe was retaliatory in nature. My termination occurred without the required notice outlined in my Direct Seller Agreement and directly followed my internal reporting of compliance concerns. These concerns are outlined in the unified complaint I filed in the **Middle District of North Carolina** on October 2, 2024 (**Case No. 1:24-CV-00824-CCE-JEP**), which is viewable on **PACER**. The court classified my filing under the **False Claims Act**, which I believe implicates broader government interests.

The interconnected nature of these issues—misclassification, retaliatory termination, and financial harm—warrants broader examination by your office. Below is a timeline summarizing key events leading to this point, followed by an overview of the supporting documentation I am providing for your review.

**Timeline of Key Events**

- **December 30, 2024**: Received IRS Notice CP40 regarding tax liability of $7,667.68 for the 2021 tax year.
- **December 6, 2024**: Withdrew my preliminary injunction motion in the **Middle District of North Carolina** under a joint agreement with LeafFilter to obtain additional documentation on the company's internal policies.                    Page 25
- **October 2, 2024**: Filed a **Unified Complaint** and motion for a preliminary injunction in the **Middle District of North Carolina (Case No. 1:24-CV-00824-CCE-JEP)**. The court classified the case under the **False Claims Act**. Details are available on **PACER**.

34

- **September 6, 2024**: Submitted a unified whistleblower complaint to the IRS and six other regulatory agencies, which includes the supporting email log of my internal communications with the company.
- **April 16, 2024**: Terminated by LeafFilter after raising systemic compliance concerns.
- **2021**:
  -
  - Worked as a Direct Seller under IRC §3508 for LeafFilter during the pandemic.
  - Attempted to launch a personal project supported by a U.S. Patent Office allowance.
  - Faced significant financial challenges due to startup costs, disputes over professional services, and legal fees.
  - Filed taxes using TurboTax, paying what I believed was owed based on available information.
- **2018**: Began work with LeafFilter as a sales representative classified under IRC §3508.

## Supporting Documentation Provided

1. **Department of Labor Six-Factor Test and IRS 20-Factor Test Analysis**
   This analysis is based entirely on LeafFilter's public-facing job advertisements and company policies, which I have provided for your review. The job descriptions and expectations outlined in these ads clearly impose employer-like controls over workers classified as "3508 Direct Sellers," including mandatory meetings, use of company tools, and detailed performance requirements. These employer-imposed controls directly contradict the independent contractor classification under IRC §3508.
2. **IRS form SS-8**
3. **Direct Seller Agreement**
   A copy of my Direct Seller Agreement with LeafFilter North LLC is included. This document embodies the company's interpretation of the "3508 Direct Seller" role. It includes provisions that misstate IRC §3508 to create a labor category that enforces employer-like controls while shielding the company from employee-related obligations by claiming IRS authority in its enforcement mechanism.

**4. Initial Whistleblower Complaint**
An excerpt from my whistleblower complaint initially submitted to both the IRS Whistleblower Office and the Federal Trade Commission on 09/06/2024 (Complaint #177491662), is included for your review. This complaint outlines systemic compliance concerns, including worker misclassification, data security risks, and discriminatory practices.

**5. Breach of Agreement Motion**
In December 2024, I withdrew my preliminary injunction motion in the **Middle District of North Carolina (Case No. 1:24-CV-00824-CCE-JEP)** under a joint Settlement Agreement with LeafFilter North LLC. This agreement required LeafFilter to engage in meaningful dialogue on all related issues, including its compliance with IRC §3508 and federal tax laws. My decision to withdraw the motion was made in reliance on LeafFilter's promise to provide substantive answers that would clarify its classification practices and compliance with federal regulations. The Settlement Agreement was explicitly intended to resolve procedural disputes and facilitate transparency by providing me with the information needed to share directly with your office and other relevant regulatory bodies. Notably, the agreement's confidentiality clause does not restrict me from sharing preceding or subsequent communications. This provision was specifically

negotiated to ensure that I could continue providing regulatory agencies with relevant documentation regarding LeafFilter's compliance practices.

While LeafFilter initially provided partial responses to my inquiries, these responses were insufficient and failed to address key issues. Most concerning, on January 6, 2025, LeafFilter's counsel informed me via email that the company would not provide any further documentation or written answers in advance of a scheduled phone call. This refusal to engage in substantive dialogue, despite a binding agreement, demonstrates a clear pattern of noncompliance and evasiveness. It also illustrates why civil litigation alone is unlikely to compel meaningful engagement from LeafFilter.

LeafFilter's conduct highlights the need for a governmental investigation. Despite being bound by a written Settlement Agreement, the company has refused to answer basic compliance questions regarding its worker classification under IRC §3508, its data security obligations under the FTC Safeguards Rule, and its employment practices. In contrast to civil litigation, a governmental investigation would require LeafFilter to answer these questions under penalty of law, ensuring that transparency and compliance is achieved.

To assist your office in assessing LeafFilter's compliance, I have included communications from LeafFilter's attorneys—including their annotated responses to my framework to capture their Position Statement—in Exhibit B of my attached draft of my Breach of Agreement Motion. These documents offer direct insight into the company's interpretation of IRC §3508 and its data security practices. I believe they demonstrate a deliberate attempt by LeafFilter to shield itself from regulatory oversight by misclassifying employees and failing to comply with federal standards.

Given LeafFilter's refusal to provide substantive responses in civil litigation, I respectfully request that your office initiate a formal review of the company's practices to ensure compliance with federal tax law.

## Purpose of Submission

This document presents a detailed and concise analysis of LeafFilter North LLC's classification of its "3508 Direct Sales Representatives" as independent contractors, based solely on public-facing and publicly available materials.

The information contained herein demonstrates that LeafFilter's classification practices fail to meet established legal standards under the Department of Labor (DOL) 6-Factor Test and the IRS 20-Factor Test. What can be ascertained from this public information alone should warrant further investigation by the NCIC.

This analysis is being provided for general context and is not exhaustive. However, my personal experience exemplifies the consequences of Federal law, specifically IRC §3508, being inappropriately applied beyond its legislative intent.

## Legislative Context of IRC §3508

IRC §3508, a tax classification originally designed to provide limited tax relief for specific independent sales roles, has been improperly incorporated into LeafFilter's Direct Seller Agreement (DSA). As shown in the attached materials, LeafFilter has created a labor category demanding all the responsibilities of employment while stripping workers of statutory protections through contractual terms.

The misuse of §3508 contradicts its legislative intent and plain language, which were never meant to justify coercive practices or misclassification. LeafFilter's practices create a labor structure that enforces employee-like duties without providing corresponding protections.

36

## Structure of Document
1. **DOL 6-Factor Test Analysis**: Demonstrates how LeafFilter fails to meet independent contractor criteria under the DOL framework.
2. **IRS 20-Factor Test Analysis**: Highlights extensive evidence of control and misclassification under IRS guidelines.
3. **SS-8 Form Submission**
4. **Leaf Job Ads**

## DOL 6-Factor Test Analysis
The Department of Labor (DOL) uses a 6-factor "economic reality" test to determine whether a worker is economically dependent on the employer (employee) or in business for themselves (independent contractor). Applying this to LeafFilter's 3508 Direct Sales Representative role:

1. **Control Over Work**
   2.
   - o **Evidence**: LeafFilter requires adherence to mandatory scripts, use of company-issued pitch books, and participation in company-mandated weekly meetings.
   - o **Conclusion**: LeafFilter exerts significant control over how services are performed, indicating an employer-employee relationship.
3. **Opportunity for Profit or Loss**
   4.
   - o **Evidence**: Job postings highlight pre-qualified leads and pre-set appointments, meaning workers rely on LeafFilter to generate sales opportunities. Sales representatives have little to no control over factors impacting profit or loss.
   - o **Conclusion**: The lack of true entrepreneurial opportunity suggests an employee classification.
5. **Investment in Equipment or Materials**
   6.
   - o **Evidence**: Workers are required to use company-issued business cards, branded clothing, and ID badges, demonstrating minimal personal investment.
   - o **Conclusion**: LeafFilter provides the tools and materials, supporting employee classification.
7. **Skill and Initiative**
   8.
   - o **Evidence**: The role is primarily scripted, with no evidence of specialized skills or independent business judgment in the job description.
   - o **Conclusion**: The job is designed to require minimal independent skill, consistent with an employee relationship.
9. **Permanency of the Relationship**
   10.
   - o **Evidence**: Full-time availability is mandated, with policies requiring advance approval for time off. These terms indicate a permanent, ongoing relationship.
   - o **Conclusion**: A sustained relationship is indicative of employee status.
11. **Integral Nature of the Work**
   12.
   - o **Evidence**: LeafFilter's revenue depends entirely on the work of its sales representatives, making the role integral to its business.

37

     o  **Conclusion**: Workers performing core functions of the business are typically employees.

**Key Takeaways**:

LeafFilter's practices fail all six DOL factors. Evidence demonstrates direct control, lack of entrepreneurial opportunity, minimal investment, and an integral role in LeafFilter's business—all hallmarks of an employee relationship.

## IRS 20-Factor Test Analysis

The IRS uses this test to evaluate the degree of control and independence in a worker-employer relationship. Below is the comprehensive application of all 20 factors to LeafFilter's classification of its 3508 Direct Sales Representatives as independent contractors:

1. **Instructions**: Mandated scripts and pitch books show extensive control, consistent with employee status.
2. **Training**: Weekly meetings and training sessions indicate significant control.
3. **Integration**: Sales reps are integral to LeafFilter's core revenue stream.
4. **Services Rendered Personally**: Representatives must personally attend appointments.
5. **Hiring Assistants**: Sales reps cannot hire or manage assistants.
6. **Continuing Relationship**: LeafFilter requires ongoing full-time availability.
7. **Set Hours of Work**: Representatives must run same-day appointments and adhere to schedules.
8. **Full-Time Work Required**: Full-time exclusivity is mandated.
9. **Work Done on Employer's Premises**: Dependency on LeafFilter's systems and infrastructure.
10. **Order or Sequence Set**: Tasks must be performed in a set order, per company guidelines.
11. **Oral or Written Reports**: Daily reports are required.
12. **Payment by Hour, Week, or Month**: Fixed commission structures limit profit control.
13. **Payment of Expenses**: Travel expenses are not reimbursed, but this factor leans neutral.
14. **Furnishing Tools and Materials**: Company provides branded tools, attire, and materials.
15. **Significant Investment**: No substantial investment from workers.
16. **Profit or Loss**: Representatives cannot independently realize profit or loss.
17. **Working for Multiple Firms**: Full-time exclusivity prohibits work for other firms.
18. **Making Services Publicly Available**: Workers do not advertise independently.
19. **Right to Discharge**: LeafFilter will terminate without cause.
20. **Right to Terminate**: Representatives face liquidated damages for early termination.

**Key Takeaways**:

LeafFilter's practices align with at least 18 of the 20 IRS factors for employee classification. The level of control, integration into the business, and restriction of independence clearly demonstrate systemic misclassification.

## References to Public Materials

This analysis is based on LeafFilter's job postings and other publicly available materials, which include:

- **Mandatory control mechanisms**: Pre-qualified leads, company-issued scripts, branded materials, and training requirements.
- **Prohibitive conditions for independence**: Full-time availability, restrictions on additional employment, and schedules dictated by the company.

## Conclusion and Call to Action

LeafFilter's systemic misclassification of its 3508 Direct Sales Representatives demands immediate scrutiny. The public-facing evidence alone demonstrates patterns of control and dependency inconsistent with independent contractor standards under both DOL and IRS guidelines.

**Form SS-8 Determination of Worker Status for Purposes of Federal Employment Taxes and Income Tax Withholding**

**PART I: General Information**

1. **Your Name**: George Platt
2. **Trade Name (if any)**: N/A
3. **Address**: 6400 Old Oak Ridge Road, Apt E-16 **City, State, ZIP Code**: Greensboro, NC 27410
4. **Telephone Number**: 571-379-3111
5. **Email Address**: george.platt62@gmail.com
6. **Date of Submission**: January 9, 2025

**PART II: Employer Information (Company You Performed Services For)**

7. **Employer's Name**: LeafFilter North LLC
8. **Employer's Trade Name**: Leaf Home
9. **Employer's Address**: 1595 Georgetown Road, Hudson, OH 44236
10. **Employer's Telephone Number**: (800) 290-6106
11. **Type of Business**: Home Improvement Services (Direct-to-Consumer Sales)
12. **Website**: www.leaffilter.com

**PART III: Information About the Work Relationship**

13. **Dates of Work**: October 2018 - April 16, 2024
14. **Describe the Work You Performed**: I worked as a sales representative classified under the "3508 Direct Seller" provision of the Internal Revenue Code (IRC) for LeafFilter North LLC. My primary role involved traveling to customer homes to perform sales consultations for LeafFilter gutter protection systems, and other Leaf Home products. LeafFilter provided pre-qualified leads, company-issued scripts, and branded sales materials. I was required to adhere to company guidelines, wear company-branded attire, and use company-prescribed tools to complete my job functions.
15. **Did You Receive Training From the Company?** Yes. I was required to attend mandatory weekly meetings and sales training sessions. These meetings provided instruction on using company materials, following company scripts, and adhering to specific sales processes. The company controlled the method and manner of my sales approach.
16. **Did the Company Provide You With Equipment or Tools?** Yes. The company provided digital tools, including a proprietary mobile app for processing customer information. They also provided branded pitch books and marketing materials. Additionally, I was required to use my personal devices (smartphone, tablet) to capture, store, and transmit customer information, including Personally Identifiable Information (PII) and financial data.
17. **Did You Have a Set Schedule?** Yes. The company controlled my schedule by providing pre-set, and same-day appointments and required me to be available full-time for

customer visits. If time off was needed, I was required to submit a formal request at least 10 days in advance, subject to management approval.

18. **Did You Receive Instructions About How to Perform Your Work?** Yes. The company provided detailed instructions regarding how to perform sales consultations, including scripts to follow, specific product demonstrations, and closing techniques. I was required to follow the company's prescribed sales methodology. Manager and field trainer ride-alongs were conducted to ensure I followed prescribed processes.

19. **Were You Required to Provide Regular Reports?** Yes. I was required to report on each appointment, including the outcome of the sales appointment outcomes, customer interactions, and follow-ups. These reports were submitted through the company's digital platform.

20. **How Did You Get Your Jobs?** The company provided all leads and pre-set appointments. The next days appointments were sent out at 9pm the night before. I did not generate my own leads or source my own customers.

21. **Did You Perform Services for More Than One Company?** No. I exclusively performed sales services for LeafFilter North LLC during my tenure. Full time availability was required.

22. **Did You Have a Significant Investment in Facilities, Equipment, or Tools?** No. The company provided all marketing materials and digital tools necessary to perform my job. The only investment I made was the use of my personal devices to capture, store, and transmit customer data.

23. **Were You Reimbursed for Expenses?** No. I was not reimbursed for mileage, travel expenses, or the cost of using my personal devices.

24. **Did You Have an Opportunity for Profit or Loss?** No. My earnings were directly tied to the completion of sales appointments assigned by the company. I had no opportunity to increase profits through independent business decisions.

## PART IV: Financial Control

25. **Who Paid for Marketing and Advertising?** LeafFilter North LLC paid for all marketing and advertising costs. Sales representatives were not responsible for generating their own leads or promoting the company's services.

26. **Did You Have a Separate Business Entity?** No.

27. **Were You Required to Use Your Personal Devices for Work Purposes?** Yes. I was required to use my personal smartphone and tablet to capture, store, and transmit customer information. This included sensitive PII and financial data, which created a significant liability.

28. **Who Controlled the Means and Methods of Your Work?** LeafFilter North LLC controlled the means and methods of my work. The company provided scripts, digital tools, sales materials, and pre-set appointments, leaving little discretion for me to deviate from their established procedures.

## PART V: Relationship of the Parties

29. **Was There a Written Contract?** Yes. I signed the Direct Seller Agreement (DSA) I included, with LeafFilter North LLC. The agreement included a coercive clause imposing a $50 per day penalty for challenging my classification as an independent contractor. This clause misrepresented the actual language and intent of IRC §3508.

30. **Did the Company Provide Benefits?** No. The company did not provide health insurance, retirement benefits, or paid time off.

31. **Did the Company Impose Penalties for Non-Compliance?** Yes. The company imposed penalties for missed appointments or failure to follow prescribed procedures. Typically being "benched", or not assigned appointments for infractions. Additionally, the DSA included a liquidated damages clause that imposed a $50 per day penalty for contesting my independent contractor status.

32. **Were You Required to Wear Company-Branded Attire?** Yes. I was required to wear company-branded clothing and display a company-issued ID badge during sales appointments.

33. **Did You Have the Right to Terminate the Relationship?** Yes, with the written 30 day notice requirement contained in the DSA. The company controlled the terms of the contract, and my termination was carried out without the required 30-day notice stipulated in the DSA. I was locked out of company systems and received a termination email the day the subject of my concerns was notified about them.

34. **Did the Company Have the Right to Terminate the Relationship?** Yes. The company unilaterally terminated my contract on April 16, 2024, in retaliation for raising compliance concerns. This termination violated the terms of the DSA.

**Exhibits Attached**:
- Exhibit A: Direct Seller Agreement (DSA)
- Exhibit B: Draft motion for breach of agreement with exhibits B, C, and D.
- Exhibit C: LeafFilter Job Descriptions and Advertisements
- Exhibit D: Please check PACER Federal Court (Case No. 1:24-CV-00824-CCE-JEP)

**Signature**: George Platt

Date: January 9, 2025

**November 2, 2024**

5:46 PM  Sat Nov 2                                                9%

google.com

### Leaf Home

## Leaf Home Water Solutions - Outside Sales Representative - Greensboro

Leaf Home · Greensboro, NC · via ZipRecruiter

🕐 2 days ago   💲 150K a year   💼 Contractor   🎓 No Degree Mentioned

[Apply on ZipRecruiter]   [Apply on LinkedIn]

## Job highlights
Identified by Google from the original job post

## Qualifications
- Excellent communication and organizational skills
- Energetic and engaging interpersonal skills with the drive to succeed
- Ability to overcome objections in the sales process
- Travel within the assigned territory based on provided and self-generated leads
- Ability to operate successfully as an independent 3508 direct sales representative

## Benefits
- Working with Leaf Home Water Solutions is more than just another job - it is an opportunity to earn a sizable and consistent income, the freedom to grow your career on your terms, and a chance to put down roots in your community
- We will supply you with pre-qualified leads and the necessary tools for success so you can set out and start earning!!
- Prequalified scheduled leads - We provide all the quality leads you to want; you close the sale
- Short sales cycle - Appointments take one hour including paperwork with the install as soon as the same day
- Financial Freedom - Earn an average of $75-100k+ in the first year...Our top rep earned $250k in 2022!!
- Weekly Pay - We pay weekly through direct deposit, so no more waiting weeks or months to be paid
- Advancement - Endless opportunity for growth and advancement (95% of our Sales Operations Managers start as Sales Reps

## Responsibilities
- While you're helping homeowners by providing clean, healthy and sustainable water for their families and increasing the performance of their plumbing and water-oriented appliances, you'll be backed by the support of Leaf Home and LeafFilter, the largest gutter protection company in North America
- Demonstrate a product that sells itself with pre-set appointments that are provided to you!
- As a 3508 Direct Sales Representative, you can generate your own sales appointment
- Meet with prospective customers using established sales methodology to educate, consult, inform, and sell!
- Responsible for using established sales methodology to sell customers the proper product that fits their needs
- Develop a rapport and conversation with the customer to facilitate one visit close
- Leverage industry-leading product samples, support, and technology to assist you in closing the sale
- Commitment to an outstanding customer service experience from beginning to end

## Job description

Are you looking for a company with unlimited compensation opportunity, weekly pay, and advancement to management roles? Leaf Home Water Solutions, a division of Leaf Home is looking to grow our team of Outside Sales Representatives TODAY!

Why Work with Leaf Home Water Solutions?
Working with Leaf Home Water Solutions is more than just another job - it is an opportunity to earn a sizable and consistent income, the freedom to grow your career on your terms, and a chance to put down roots in your community. We will supply you with pre-qualified leads and the necessary tools for success so you can set out and start earning! While you're helping homeowners by providing clean, healthy and sustainable water for their families and increasing the performance of their plumbing and water-oriented appliances, you'll be backed by the support of Leaf Home and LeafFilter, the largest gutter protection company in North America.

Demonstrate a product that sells itself with pre-set appointments that are provided to you! Our highly successful, multi-channel lead generation platform provides high-converting, and quality pre-set sales appointments. As a 3508 Direct Sales Representative, you can generate your own sales appointment. Best of all most sales close in an hour or less.

What's in it for me?
· Prequalified scheduled leads - We provide all the quality leads you to want; you close the sale
· Short sales cycle - Appointments take one hour including paperwork with the install as soon as the same day
· Superior product - Our products are factory direct...there is no comparison!
· Financial Freedom - Earn an average of $75-100k+ in the first year...Our top rep earned $250k in 2022!!



42



**EXHIBIT E** – **March–April 2025 Correspondence with LeafFilter Counsel:**
**Retaliation, Data Breach, and Refusal to Negotiate**

Description:
This exhibit summarizes email communications between Plaintiff George Platt and Defendants'
counsel, Joseph Reiner Blalock, exchanged between March 19 and April 1, 2025, following the
Court's March 17, 2025, order in Case No. 1:24-CV-824-CCE-JEP. The correspondence
documents Plaintiff's good-faith efforts to negotiate a resolution, Defendants' refusal to
participate in those efforts in bad faith, and their failure to take action following a consumer data
breach involving Customer X's financial information. These events support claims of retaliation
(Counts 2–3), unfair and deceptive trade practices under N.C. Gen. Stat. §75-1.1 (Count 4), and
breach of DSA §6.01 (Count 7). All communications referenced herein have been preserved in
their original form and will be made available upon judicial request or through discovery.

Relevance:
This correspondence demonstrates:
(1) Defendants' improper demand for Plaintiff's confidential agency filings as a condition for
settlement engagement (¶ 8.o, Counts 2–3);
(2) their refusal to negotiate in retaliation for Plaintiff's protected activity, including EEOC and
IRS filings (¶ 8.c–i, p, Counts 2–3);
(3) their failure to act following Plaintiff's report of a March 20, 2025, data breach, in violation
of DSA §6.01 and the FTC Safeguards Rule, 16 C.F.R. §314.4 (¶ 8.q, Counts 4 and 7); and
(4) a broader pattern of obstruction implicating the privacy and contractual protections of
approximately 2,000 Direct Sellers nationwide (¶ 11).

Narrative Summary:
On March 19, 2025, following the Court's March 17 order authorizing further action, Plaintiff
transmitted a structured proposal to Defendants' counsel, Joseph Blalock, seeking to resolve his
claims regarding worker misclassification under IRC §3508, unlawful retaliation, and systemic
data security failures under DSA §6.01 and the FTC Safeguards Rule (16 C.F.R. §314.4). Rather
than address the proposal, Blalock responded by demanding "all correspondence" between
Plaintiff and federal regulatory agencies (including the IRS, Department of Labor, Federal Trade
Commission, and Equal Employment Opportunity Commission) (Excerpt 1). Plaintiff rejected
the request, correctly characterizing it as a premature and improper attempt to initiate discovery
outside of litigation (Excerpt 2). Later that same day, Blalock declared an "impasse," stating that
LeafFilter would "sit back and wait for service" (Excerpt 3), further evidencing retaliatory intent
based on Plaintiff's regulatory disclosures (¶ 8.o–p, Counts 2–3).

On March 24, 2025, Plaintiff reported a potential consumer data breach after receiving an
unsolicited voicemail on March 20, 2025, from a LeafFilter customer ("Customer X"), nearly
one year after his April 2024 termination. Under LeafFilter's policy requiring use of personal
devices to collect and store consumer data, Plaintiff retained the following sensitive materials
relating to Customer X: her full name, address, and contact information; a scanned image of her
deposit check, including full account and routing numbers; a company-issued deposit slip; and
multiple photographs of her residence taken during the appointment. This material remained on

Plaintiff's personal device and was disclosed to counsel in accordance with his obligations under DSA §6.01 and federal data security standards (Excerpt 4).

LeafFilter's failure to purge this information upon separation, or to implement proper security protocols governing personal-device use, reflects a systemic breakdown in compliance with 16 C.F.R. §314.4 and its own contractual obligations under DSA §6.01. Despite the serious nature of this breach and Plaintiff's formal notification, Blalock's only response by the April 1 deadline was, "let me get back to you" (Excerpt 5). No corrective action was taken. This failure to act reinforces Plaintiff's claims under the North Carolina Unfair and Deceptive Trade Practices Act (Count 4) and for breach of contract (Count 7), and it highlights continuing risks to thousands of consumers and Direct Sellers whose personal and financial data were subject to the same flawed protocols (¶ 11).

Key Excerpts:

March 19, 2025, 10:02 AM – Blalock Demands Agency Filings (¶ 8.o):
"Before my client will consider engaging with you further, we'll need to get some information regarding the alleged agency complaints you've filed. Can you send us all correspondence that you've sent to all federal agencies regarding Leaffilter?"
Relevance: This demand for confidential regulatory filings, which are protected under 29 U.S.C. §215(a)(3) and 31 U.S.C. §3730(h), was made as a precondition to negotiation and evidences unlawful retaliation, supporting Counts 2–3.

March 19, 2025, 10:27 AM – Platt Rejects Tactic (¶ 8.o):
"Regarding your request, it is tantamount to a premature discovery request for documents to which your client is not entitled at this stage… If your client is serious about resolving these matters privately, I encourage you to respond substantively to my proposal."
Relevance: Plaintiff's response reflects a good-faith attempt to reach resolution, in contrast to Defendants' obstructive posture, further supporting the retaliation claims alleged in Counts 2–3.

March 19, 2025, 10:43 AM – Blalock Declares Impasse (¶ 8.p):
"Looks like we are at impasse then until you make an actual demand… Happy to sit back and wait for service of your complaint."
Relevance: Blalock's refusal to negotiate, following Plaintiff's protected filings and comprehensive proposal, demonstrates retaliatory intent and supports the allegations set forth in Counts 2–3.

March 24, 2025, 8:57 AM – Platt Reports Data Breach (¶ 8.q):
"I remain in possession of [Customer X's] full name, address… An image of her deposit check (including account and routing numbers)… This data remains stored on my personal device… This situation raises serious concerns under the FTC Safeguards Rule (16 C.F.R. §314.4)."
Relevance: Plaintiff's disclosure of this security lapse illustrates a systemic failure to comply with contractual and regulatory data protection duties, directly supporting the claims for breach of contract and unfair trade practices (Counts 4 and 7).

45

April 1, 2025, 3:53 PM – Blalock's Inaction (¶ 8.q):
"As for the return of [Customer X] information, let me get back to you on that."
Relevance: Blalock's failure to take any follow-up action or initiate remediation, despite the nature of the breach and Plaintiff's prior warnings, further supports the claims in Counts 4 and 7.

Certification:

Plaintiff certifies that the excerpts above are true and accurate copies of the original correspondence with Defendants' counsel between March 19 and April 1, 2025, preserved in original form, and available upon judicial request or in discovery.

Dated: April 30, 2025

George Platt
Plaintiff, Pro Se
6400 Old Oak Ridge Rd, Apt E-16
Greensboro, NC 27410
(571) 379-3111
George.platt62@gmail.com

# Exhibit F – April 2024 Email Thread with Brian Swan and HR

This Exhibit documents a contemporaneous email record that substantiates Plaintiff's claims of retaliatory termination under the Fair Labor Standards Act (29 U.S.C. §215(a)(3)), False Claims Act (31 U.S.C. §3730(h)), and North Carolina public policy. It also evidences Plaintiff's protected disclosure regarding Defendants' misrepresentation of IRC §3508 within their Direct Seller Agreement.

**April 14, 2024 – 2:24 PM**
**From:** George Platt george.platt62@gmail.com
**To:** HR
**Subject:** Misclassification and Agreement Concerns

"Sect. 4.01, as you represent IRC Sect. 3508 in bold print, the code requires me to represent myself as an independent contractor/non-employee or potentially face a $50.00 per day fine in liquidated damages, plus reasonable attorney's fees if I contest this relationship."

"The representation of IRC Sect. 3508 contained in our agreement bears little resemblance to IRC Sect. 3508 as published […] and seems to be an attempt to give a term the force of law, which could have public policy implications."

*Note: Full message is on record in Case No. 1:24-CV-824-CCE-JEP and incorporated by reference.*

**April 15, 2024 – Morning**
Plaintiff spoke by phone with Regional Manager Brian Swan, who acknowledged receiving Plaintiff's concerns and stated he would speak with Operations Manager Chris Oakley the next day. Within hours of that conversation, Plaintiff was locked out of LeafFilter systems and communications.

**April 16, 2024 – 11:16 AM**
**From:** Brian Swan brian.swan@leafhome.com
**To:** HR, Theresa Lynn, George Platt, bswan@leafhome.com

George,

Your contract was eliminated by our operations team for failing to report to work or communicate your intention to continue working or not. Per information made available, you were not reachable nor returned any communications sent to you for a period of approximately two weeks. Your contract being terminated had no contextual relation to any of the conversations you and I have held and was facilitated independently of the HR department. I have no insight or response as to the proprietary information you referenced below.

The investigation I am leading is still ongoing and should reach its conclusion soon.

– Brian

**April 16, 2024 – 11:18 AM**
**From:** George Platt george.platt62@gmail.com
**To:** Brian Swan, HR, Theresa Lynn

Thank you for informing me.

**April 23, 2024 – 9:42 AM**
**From:** Brian Swan brian.swan@leafhome.com
**To:** George Platt

George,

Our Legal Team has asked me to forward the below message to you.

Thank you for your email. Your email indicates that you are terminating your Independent Contractor Agreement with LeafFilter. This is just a reminder that you are still bound by Section VIII of the Agreement, including the non-disclosure and non-solicitation provisions. You are prohibited from disclosing any confidential information or trade secrets, which is more inclusive than just the price sheet. It includes confidential information, proprietary information, customer lists/records/information, pricing policies, business plans, sales/marketing plans and materials, etc. In addition, any LeafFilter materials you received as part of your training are considered confidential.

We wish you the best in your future endeavors.

– Brian


This Exhibit supports the following factual and legal contentions and is already in the courts possession from the previous matter:

- **Causation and Timing**: Termination occurred within 24 hours of Plaintiff's protected communication concerning IRC §3508.
- **Protected Activity**: Plaintiff raised misrepresentation of federal law and potential public policy violations.
- **Pretext**: Defendants cited "unreachability" despite direct contact and acknowledged ongoing investigation.
- **Retaliation**: Swan's communications reflect a deliberate shift in circumstance from termination to resignation immediately following Plaintiff's statutory complaints.
- **Retention**: All customer information gathered per "Leaf protocal".

48

49